ADAMS, Supreme Court Justice
(Re-
tired), (dissenting-):
This writer takes quite a different view of the nature of this proceeding. This proceeding is not civil or criminal. It is in fact an action in personam against a judge in question, to ascertain whether he has been guilty of judicial conduct to warrant reprimand or removal from office.
In reviewing the authorities, it is easy to construe this as though it were impeachment. In fact, the Constitution under which this proceeding is brought expressly states that it complements impeachment. It is of interest to look back into the law of impeachment and examine its nature. We inherited the impeachment law from the Mother Country. It has proven to be most unworkable and unsatisfactory. In fact, the Mother Country had the same experience with it and was getting away from the law of impeachment about the time it was introduced into our country. The distinguishing features of the law of impeachment and the constitution under which we are dealing lie in certain crimes enumerated in the constitution required to be proven for a judgment of impeachment, whereas, here, a justice “may be disciplined by private reprimand or removed from office for willful or persistent failure to perform his duties, or habitual intemperance, or conduct unbecoming a member of the judiciary."
We have no guide to ascertain what standards shall be used to sustain conduct *23 unbecoming a member of the judiciary. It is helpful to observe the rule laid down by the New York Supreme Court, Appellate Division in In Re Sarisohn, 26 A.D.2d 388, 275 N.Y.S.2d 355 (1966):
“Cause” within Constitution and statutes authorizing removal of judge of district court for cause includes corruption, general neglect of duty, delinquency affecting general character and fitness for office, acts violative of law inspired by interest, oppressive anil arbitrary conduct, reckless disregard of litigant’s rights, and acts justifying the finding that future retention of office is inconsistent with fair and proper administration of justice. Const, art. 6, § 22, subd. i; Uniform Dist.Ct.Act § 103(e) ; Code Cr. Proc. § 132; Public Officers Law, §§ 32, 36.
It is pertinent to give some background t'o the origin as well as the nature of the Judicial Qualifications Commission. This Court, on June 7, 1949, integrated the Bar of the State of Florida, thus creating a unified Bar with the power of collecting dues, thus enabling the Bar to undertake various programs in the interest of a better system of jurisprudence. There were those at that time who questioned the integration action with regard to whether the Bar would not at some future time be a detriment to the Court, its creator. Suffice it to say the Bar has been militant and no doubt its action in a large measure has brought about a constitutional revision creating the powers under which this Commission functions. The people of this State evidently approve of the leadership of the Bar, because on the 8th day of November, 1966, they approved a revision of the Constitution setting up the Judicial Qualifications Commission. Pursuant thereto, this Court promulgated rules of procedure for the Commission (240 So.2d 465). Later, a new set of rules was promulgated (276 So.2d 10). Thereafter, the Legislature proposed a revision of Article V, Section 17A, which revision was approved by the voters at a special election in 1972.
So we have here a Justice of this Court claiming his office by election of the sovereign people, and we also have a Judicial Qualifications Commission set up pursuant to the sovereign act of the people, and it is significant to point out that that Commission is composed of a rather select group of judges and laymen. Therefore, their recommendation comes to us with perhaps greater dignity than a verdict of a jury or the findings of a grand jury. We should certainly be very reluctant to repudiate their findings of fact. Our duty, however, is to apply the law to the facts which they have found. Sound public policy dictates that the action of the Commission be kept within reasonable bounds to safeguard the institution of the Court as well as to punish or oust an offending justice. Experience teaches us that there are always disgruntled litigants who will hasten to the Commission seeking reprisal against a judge who chanced to rule against him. There, too, the Commission should be aware of the damage to the image of the Court itself if each and every infraction of the rules of ethics is brought to bear against a justice. Such action ultimately reflects unfavorably against the Court. So the Commission must be aware of its duty as between punishing a justice or damaging the institution.
There has been much said and written about the action of this Court in disbarment proceedings brought against lawyers. This is quite a different situation. In proceedings against a lawyer, if he is disbarred, his means of making a living are taken away from him, and then, too, a lawyer is not sitting upon a pedestal as is a Justice of this Court. The public can decline to do business with the lawyer if they choose, whereas a Justice of this Court is here to dispose of the business of all citizens. The client can choose his lawyer, but his judge is chosen for him. Therefore, it *24 would seem that a much higher standard would be required of judges than of lawyers. The argument is also made that a judge has a property right in his office. That is true. He has a two-fold property right: one to the emoluments of the office, and the other as a trustee, entrusted to him by the people who elected him. Yet it is quite understandable that any property right which he might have could be forfeited by his dereliction of duty or wrongful conduct.
It would not serve a good public purpose for this dissenting opinion to delineate all of the conduct and behavior of the judge now in question, and we are reminded of the late great James Russell Lowell, when he said it is easier to be generous than just. However, this prolonged, bizarre episode appears so convincing that this judge in question solicited the document in question, showed every indication of using it until suspicion occurred, and then destroyed it, indicating that he was going contrary to the opinion, and stated that he had set a trap to catch another person, which surely could have been none other than one of his colleagues. This, coupled with the fact that he showed an utter disregard of personally processing the case himself, was done while common honesty and simple logic indicate that when this memorandum came to his attention he should have brought it to the attention of his colleagues to be dealt with. All of which lends verity to the testimony of Attorney Mason, who had given him a suggested opinion.
There appears to be no motive for Attorney Mason, who had lived with Justice Boyd, played with him, enjoyed friendship with him over a period of many years, to give testimony against him. It is the writer’s conclusion, therefore, that his misconduct was so great and continued over a long period of time as to show a complete disregard for the dignity and welfare of the office which he occupies. Hence I disagree with the conclusion reached by this Court.